# Comprehensive Sentencing Mitigation Report

Case No. 3:25-cr-113-WWB-SJH
United States of America v. Jack Dymond Leach

United States District Court
Middle District of Florida
Jacksonville Division

Prepared by:
The Cord Strategies Group, LLC
Jacksonville, Florida

## **Contents**

| | |
|---|---|
| Introduction | 1 |
| Mr. Leach's Current Posture | 1 |
| Nature and Characteristics of the Offense/Factors in Mitigation of the Offense | 3 |
| Mr. Leach's History and Characteristics | 5 |
| Impact of History of Early-Age Trauma on Mr. Leach | 9 |
| Issues of Therapeutic Concern | 10 |
| Civic, Charitable, Public Service, and Record of Prior Good Works | 11 |
| Mr. Leach's Community Support | 12 |
| Statistical Information | 13 |
| Recently Sentenced Attempted Production of Child Pornography | 14 |
| Factors Militating in Favor of a Variance from the Advisory Guidelines | 15 |
| Certainty vs. Severity of Punishment | 17 |
| Conclusions | 18 |
| Appendix I Exhibits | A-O |
| Appendix II Exhibits (*Letters of Support*) | 1-3 |

**Comprehensive Sentencing Mitigation Report**

United States of America v. Jack Dymond Leach
Docket No.: 3:25-cr-113-WWB-SJH

**Introduction**

According to the provisions of 18 U.S.C. § 3553, the court shall impose a sentence that is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing, and in determining such sentence, among other things, the court shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant, and (2) the need for the sentence imposed as set forth in § 3553(a)(2). In consideration of the sentence that must be imposed in this case, the following sentencing factors are presented for consideration by counsel and the Court in reference to mitigation of the defendant's sentence:

**Mr. Leach's Current Posture**

On October 21, 2025, Mr. Leach pleaded guilty to Count Three of the Indictment charging him with attempted production of child pornography.[1] The plea was entered pursuant to a written plea agreement. Consequently, Mr. Leach has acknowledged responsibility for the offense as charged. He has remained completely cooperative with the government and has fulfilled the terms of his plea agreement. Mr. Leach has fully come to terms with his error in judgment since the government's case has come into fruition. Mr. Leach greatly laments his involvement in this offense, and the associated harm to its victims, as well as the costs and inconvenience to the government and the people of the United States.[2]

Mr. Leach was initially arrested on May 29, 2025 and was ultimately detained on June 5, 2025 pending further proceedings. He was taken into custody without incident or risk of harm to law

---

[1] The plea was entered less than five months of Mr. Leach's arrest.

[2] Leach, Jack. Personal interview. 6 November 2025.

1

enforcement.  As of the date of sentencing, he will have successfully completed approximately 12 months (418 days) in custody at the Baker County Detention Center without incident.

*Collateral Consequences of the Offense*

In addition to the usual consequences of incurring a felony conviction, such as the loss of certain civil rights, including the privilege of voting, Mr. Leach has lost the ownership of a profitable company he operated for the past 13 years.[3]  The company developed software systems and Mr. Leach received a six figure income from the business.  As a part of Mr. Leach's sentence, he will incur technology restrictions, including being restricted from using certain online services, social media, and devices that connect to the Internet.  The access to online activity was indispensable to Mr. Leach's vocational history, which was not connected to the offense of conviction.  Consequently, this will lead to employment restrictions as he will not likely be able to return to the field of software development upon the completion of his sentence.

Mr. Leach's two sons will suffer from the loss of household income by virtue of his conviction and sentencing in this case.  In addition to the loss of the support to his sons, his youngest son is still mourning the loss of Mr. Leach's father, his grandfather, who died in February 2025.  Despite being detained, Mr. Leach has only been able to support his son's emotional condition by writing and submitting chapters from an anticipated book to the son to remotely render him comfort.  The 15-year-old son, a high school student, suffers from ADHD.[4]  According to Mr. Leach, he was a straight-A student but fell from that level for the last quarter of the recently finished school year.

---

[3] Collateral consequences are legal and regulatory sanctions and restrictions that limit or prohibit people with criminal records from accessing employment, occupational licensing, housing, voting, education, and other opportunities. From https://niccc.nationalreentryresourcecenter.org. National Inventory of Collateral Consequences of Conviction.

[4] De Lara, Valarie M.D. 29 June 2026. Personal interview.

Last, Mr. Leach's continuation as a licensed private pilot will be substantially impaired.  Mr. Leach has been licensed since 2011, which was last renewed on September 13, 2022.[5]  While the Federal Aviation Administration (FAA) does not permanently ban individuals with felony records from flying for personal use, there are a number of restrictions.  The most immediate jeopardy to Mr. Leach's license will be his inability to complete recurrent training, log hours, and medical recency requirements to stay legal.  The FAA requires a minimum of one hour of flight training and one hour of ground training with an instructor every 24 calendar months, a standard known as a Flight Review.[6]

### Nature and Circumstances of the Offense/Factors in Mitigation of the Offense

There are several factors in mitigation of the nature and circumstances of the offense that may be pertinent to the provisions of USSG §1B1.4 (Information to Be Used in Imposing Sentence).[7]  First, while Mr. Leach does not meet the requirements for the downward adjustment for Certain Zero-Point Offenders, he has no criminal history points at the time of sentencing.  Mr. Leach has no history of violence or antisocial behavior, or prior history of behavior involving the sexual exploitation of children.  Consequently, it may be argued that Mr. Leach does not represent an ongoing third-party risk of physical harm or danger to the community.  Otherwise, the offense represents a marked deviation by Mr. Leach from an otherwise law-abiding life.

---

[5] Appendix I, Exhibit A.

[6] Appendix I, Exhibit B.

[7] This section distinguishes between factors that determine the applicable guideline sentencing range ((§1B1.3) and information that a court may consider in imposing a sentence. The section is based on 18 U.S.C. § 3661, which recodifies 18 U.S.C. § 3577. The recodification of this 1970 statute in 1984 with an effective date of 1987 (99 Stat. 1728), makes it clear that Congress intended that no limitation would be placed on the information that a court may consider in imposing an appropriate sentence under the future guideline sentencing system. A court is not precluded from considering information that the guidelines do not take into account. USSG §1B1.4, comment. (backg'd.).

Second, although the offense of conviction was detrimental to the victims, it was an inchoate offense (i.e., an attempt) executed in the least onerous manner, as contemplated by the guidelines.[8] This is evidenced by the fact that only two of the six specific offense characteristics listed in §2G2.1 for calculation of the offense severity score, were applicable to the offense in this case.[9] Although this detail does not diminish the seriousness of the offense, it may suggest a distinction among other cases laden with more aggravating circumstances by comparison.

Third, although Mr. Leach makes no personal excuses for the conduct giving rise to the offense of conviction, at all times of relevant conduct, the health of his father -- who was suffering from obesity and late-stage heart disease -- began an irreversible decline culminating in his death.  Mr. Leach was in suspense about his father's mortality from November 2022 – the first month of relevant conduct – until his death on February 27, 2025, a period of time inclusive of the scope of relevant conduct.[10]  Since the emotional dislocation regarding his father's illness and death traversed the span of Mr. Leach's criminal conduct, it bears a relationship to the larger circumstances of the instant offense.

Fourth, during the earliest phase of relevant conduct, Mr. Leach incurred a harrowing event that caused acute psychological dislocation.  In his capacity as a licensed pilot, on December 30, 2022, he took his 13-year-old son up in a flight when the plane caught fire at about 5,000 feet.  The flight was intended to go from the Tri-Cities Airport, Blountsville, Tennessee, to the North Florida Regional Airport, St. Augustine, Florida.  Mr. Leach related that he became paralyzed with fear, believing that the plane was going to crash, killing both he and his son.  Fortunately, Mr. Leach was able to crash-land the plane before

---

[8] Although the offense of conviction is an attempt, Mr. Leach acknowledges, there were three ("pseudo-counts" of) identifiable victims based on principles of relevant conduct and the special instruction at §2B2.1(d).

[9] The guideline at §2G2.1(c) also includes a featured cross references available for application, which is not applicable in this case.

[10] Appendix I, Exhibit C.

4

leaving the vicinity of the airport.  He indicated that due to the trauma of the event, he never fully recovered mentally and emotionally, and received no psychological intervention. This situation constituted an inflection point that compromised Mr. Leach's mental and emotional status at the time overlapping the offense conduct.

Finally, Mr. Leach's business suffered an extensive downturn corresponding to dates associated with the offense of conviction and its relevant conduct (November 19, 2022 through May 8, 2025), Mr. Leach related that his digital services company, known as Dymeng Technology Solutions, Inc., was surviving with only one client from 2022 through 2025.  Prior to retraction, the business had up to 30 employees.  This financial hardship further augmented Mr. Leach's mental condition at the time of the offense conduct.

### Mr. Leach's History and Characteristics

The following information regarding Mr. Leach's history and characteristics is offered as a supplement to the very thorough presentence investigation and report conducted by the United States Probation Office.  These factors are remarkable and may constitute circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence other than that prescribed by the guidelines.

Mr. Leach's life narrative should be expanded to include aspects appropriate for consideration to sentencing.  Much of this information will inform the Court of influences on his mental and emotional history and personal data not reflected in the presentence report.  It is anticipated that the collective impact of this information will contribute to the proposition that a sentence under the advisory guideline system would produce a sentence greater than necessary to satisfy the statutory purposes of sentencing.

*Mr. Leach Experienced Several Adverse Childhood Experiences, Trauma, and Exposure to Pornography*

Although Mr. Leach described his childhood to the probation office as "normal" his actual experience was far from it.  Despite being reared in a two-parent household he described his mother as

5

"cold, manipulative, and greedy."  He added that at an early age his mother had "inappropriate conversations about sexual topics" around him during his formative years.  During this time he reported that she also smoked marijuana, a form of an adverse childhood experience (ACE).[11]  Mr. Leach reported that for the forgoing combination of reasons, he experienced a historically strained relationship with his mother.

These circumstances were augmented by Mr. Leach's report that at age 10, he was exposed to the negative implications of spending time at a group home for disaffected youth run by his grandparents. He stated the he hated the experience, which included seeing fecal matter on the walls and other undesirable experiences.  Mr. Leach stated that he had no outlet from this forced exposure at the facility and was traumatized by what he saw.  At age 12, Mr. Leach related that he had two friends whose mother abandoned them and they lived exclusively with their father.  Mr. Leach stated that during his time visiting the brothers, he was exposed to comic magazines featuring Japanese pornography, known as Bondage Fairies,[12] with graphic images of fairies being raped.[13]  There was no adult intervention to these experiences and Mr. Leach and his friends were able to persistently view these materials.  The failure of

---

[11] Adverse childhood experiences have been associated with chronic stress sustained over time, which can be damaging to the body and the brain, particularly for children, because the earliest years are a critical time for development. The accumulation of excessive stress in the body interferes with the development of healthy neural, immune and hormonal systems and can alter the expression of our DNA. Multiple ACES over time—especially without adequate adult support—can affect the nervous, endocrine and immune systems, and have lasting effects on attention, behavior, decision-making and response to stress throughout a lifetime." Adverse Childhood Experiences, https://www.ncsl.org/health/adverse-childhood-experiences.

[12] Bondage Fairies is an erotic manga [Japanese comic book] about highly sexual, human shaped female forest fairies with wings. It is among the earliest sexually explicit manga (eromanga) ["erotic magazine"] commercially published in the United States where it dates from 1994. The sexual content varies from intercourse to masturbation, lesbian sex, to fetishism, to bondage, to bestiality (with animals, including birds and insects). In *Wikipedia.* https://en.wikipedia.org/wiki/Bondage Fairies.

[13] Appendix I, Exhibit D.

not detecting Mr. Leach's preadolescent exposure to pornographic literature represented a form of physical neglect, another manifestation of an adverse childhood experience.

To augment the negative implications of Mr. Leach's early-age exposure to extreme pornographic images were the inappropriate conversations by his mother about sexual topics beginning earlier during his youth. Mr. Leach insinuated that his mother may have had a sex addition. The context of these parental circumstances represented a form of emotional abuse, yet another manifestation of an adverse childhood experience. Accordingly, he suffered lack of guidance as a youth around the experience of sexual education.

Mr. Leach indicated that prior to age 12, while still in preadolescence, an adopted uncle of one of Mr. Leach's friends bought and furnished him with beer. None of these events were detected by his parents or other custodial caregivers and thus, Mr. Leach never received psychological intervention for this special form of neglect. At age 14, Mr. Leach related that he suffered from an episode of carbon monoxide poisoning that resulted in hospitalization and treatment for two days. According to medical research literature, carbon monoxide poisoning in juveniles can result in delayed neuropsychiatric sequel (DNPS).[14] The findings based on a case study of a 13-year-old boy revealed that exposure can result in conditions such as long-term neuropsychiatric sequela and other systemic complications. Cerebral atrophy is also seen in patients suffering from DNPS.[15] This condition can include mild mood and behavioral changes.

By the time he reached age 16, Mr. Leach reported that he unfortunately discovered and watched "extra kinky" sex videos in his home without his parents' knowledge. It was about this time that Mr. Leach

---

[14] Gavrieli H, Noyman I, Hershkovitz E, Taragin B and Hazan G (2022) Delayed Neuropsychiatric Sequel Following Pediatric Carbon Monoxide Poisoning: A Case Report and Literature Review. Front. Pediatr. 10:861254. doi: 10.3389/fped.2022.861254.

[15] *Ibid.*

began the use of alcohol and marijuana.  Within a year of these circumstances, at age 17, Mr. Leach fathered a daughter.  This development forced Mr. Leach to drop out of high school while in the 11th grade to support his daughter.  Mr. Leach reported that at age 19, he subsequently successfully petitioned the court for full custody of his daughter.  He was scheduled to go to vocational school in the aftermath of this event but acknowledged that he lost his way.

At age 19, Mr. Leach was residing in Stephentown, in upstate New York.  When Mr. Leach was age 22, his daughter was in a serious automobile accident.  In his mid-twenties, Mr. Leach began a phase of alcohol abuse.  He related that at the time, he had a "drinking partner" who was a gay male, who made an inappropriate physical act toward him, causing Mr. Leach a great deal of consternation.[16]

*Mr. Leach's Physical Condition*

There are two final remarkable features of Mr. Leach's history containing information regarding the state of his physical condition.  First, although Mr. Leach's height and weight are mentioned in the presentence report, it should be pointed out that he is clinically obese.  According to the Centers for Disease Control, a person 5'6" and 260 pounds, is considered to be obese.  That combination results in a body mass index (BMI) of 42, a Class 3 obesity, which is the highest class for the disease.  The CDC indicates that people who are overweight may have a higher risk of conditions such as heart disease, type 2 diabetes, sleep apnea, and colorectal cancer; some of which can be life threatening.[17]  This information is particularly relevant to Mr. Leach's case because as stated earlier, his father suffered from obesity and succumbed to heart disease at age 63.

---

[16] *Id.* Jack Leach.

[17] Research linked to the CDC shows that excess weight can reduce life expectancy by an average of **2.4 years**. However, for severe (Class 3) obesity, this reduction can range from **5 to 20 years**. Life Expectancy for People with Class 3 Obesity. From https://www.healthline.com/health/obesity/class-3-obesity-life-expectancy.

Second, as reflected in the presentence report, during his mid-teens, Mr. Leach suffered from an episode of carbon monoxide (CO) poisoning.  According to the National Institutes of Health, carbon monoxide poisoning can cause significant long-term, sometimes permanent, neurological and physical health effects in juveniles due to brain injury and oxygen deprivation.[18]  Mr. Leach reported that he spent at least two days in the hospital for treatment.  Common long-term sequelae include cognitive impairment, memory loss, learning disabilities, behavioral changes, and motor dysfunction, sometimes arising as  delayed neuropsychiatric syndrome weeks after exposure.[19]  Considering the nature of the offense, there is a possibility that Mr. Leach could have suffered neurocognitive damage associated with the incident.  Consequently, as a feature of Mr. Leach's history, this factor should be relevant to a § 3553 analysis affecting the calculus of the sentence in this case.

**Impact of History of Early-Age Trauma on Mr. Leach**

Bessel van der Kolk, M.D., a psychiatrist, and leading researcher and practitioner in the field of the neuroscience of trauma, and posttraumatic stress disorder, has explained the causal relationship between trauma and the brain's sympathetic (physiological) response, and the implications for understanding the behavioral constraints of its victims:

> We are obviously still years from attaining that sort of detailed understanding [of the ontological workings between brain and mind], but the birth of three new branches of science has led to an explosion of knowledge about the effects of psychological trauma, abuse, and neglect. Those new disciplines are neuroscience, the study of how the brain supports mental processes; developmental psychopathology, the study of the impact of adverse experiences on the development of mind and brain; and interpersonal neurobiology, the study

---

[18] Rose JJ, Wang L, Xu Q, McTiernan CF, Shiva S, Tejero J, Gladwin MT. Carbon Monoxide Poisoning: Pathogenesis, Management, and Future Directions of Therapy. Am J Respir Crit Care Med. 2017 Mar 1;195(5):596-606. doi: 10.1164/rccm.201606-1275CI. Erratum in: Am J Respir Crit Care Med. 2017 Aug 1;196(3):398-399. doi: 10.1164/rccm.1963erratum. PMID: 27753502; PMCID: PMC5363978.

[19] *Id.* Valarie De Lara, M.D.  Personal interview. During the interview with Dr. De Lara -- a licensed pediatrician -- she responded to an inquiry about her experience with carbon monoxide poisoning in juveniles, stating that while she has  seen neuropsychological impacts post-poisoning, but is not aware of the long term effects because she has had no follow up of patients into adulthood.

of how our behavior influences the emotions, biology, and mind-sets of those around us.

Research from these new disciplines has revealed that trauma produces actual physiological changes, including a recalibration of the brain's alarm system, an increase in stress hormone activity, and alterations in the system that filters relevant information from irrelevant. We now know that trauma compromises the brain area that communicates the physical, embodied feeling of being alive. These changes explain why traumatized individuals become hypervigilant to threat at the expense of spontaneously engaging in their day-to-day lives. They also help us understand why traumatized people so often keep repeating the same problems and have such trouble learning from experience.  We now know that their behaviors are not the result of moral failings or signs of lack of willpower or bad character—they are caused by actual changes in the brain.[20]

Mr. Leach's history makes it clear that he has been a victim of trauma and several adverse childhood experiences, beginning early in life, continuing throughout late adolescence.[21]  Research indicates that the impact of trauma on the brain has emerged as an offender characteristic which explains – but not excuses -- criminal behavior.  As Dr. van der Kolk has articulated, trauma distorts brain functioning, and in turn, volitional controls.  In view of this factor, it is urged that the Court apply the rule of parsimony and exercise a bias toward imposing the least onerous sentence possible under the law.

### Issues of Therapeutic Concern

According to 18 U.S.C. § 3553(a)(2)(D), one of the factors to be included in the calculus of the need for the sentence imposed is to "provide the defendant with needed … <u>medical care</u>, or other correctional treatment in the most effective manner."  The evidence in this case reveals that the nature of the offense, combined with Mr. Leach's psychological condition, may require the need for future

---

[20] Van der Kolk, Bessel, M.D. <u>The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma</u>. Penguin Books Limited, 2014.

[21] A Centers for Disease Control-Kasier Permanente ACE study found that adults with an ***ACE score of 4 or more were at significantly greater risk for many behavioral, physical, and mental health issues later in life***. https://www.joiningforcesforchildren.org/what-are-aces.

treatments necessary to bring about improvements to his condition while serving a sentence in a prison setting.

Given the circumstances of the offense, coupled with early-age trauma, Mr. Leach acknowledges the need for therapeutic programming to address his condition. The Bureau of Prisons has a nonresidential sex offender treatment program that is suitable for Mr. Leach's participation.[22] Accordingly, Mr. Leach's willingness to participate in treatment to bring about self-improvement addresses concerns for future risk management, as well as deterrence, thereby militating in favor of the shortest sentence possible for imposition by the Court.

### Civic, Charitable, Public Service, and Record of Prior Good Works

Mr. Leach has been involved in several aspects of good works benefitting individuals and the community. From 2012 through 2017, Mr. Leach received the Most Valuable Professional (MVP) award by the Microsoft Corporation.[23] The program recognizes exceptional community leaders for their technical expertise, leadership, speaking experience, online influence, and commitment to solving real world problems. Those receiving this award demonstrate a strong commitment to using their expertise in digital technology to the benefit of persons in need of help to increase their capabilities in the field.[24]

Second, Mr. Leach has been a financial and moral supporter of Fostering Connections, Jacksonville, Florida. The mission of the organization is to help youth impacted by foster care or trauma

---

[22] The Sex Offender Treatment Program – Nonresidential (SOTP-NR) is a moderate intensity program designed for low to moderate risk sexual offenders. The program consists of cognitive-behaviorally based psychotherapy groups, totaling 4-6 hours per week. The program is located at FCI Marianna Florida, which is a medium level institution. Federal Bureau of Prisons: Directory of National Programs (May 18, 2017).

[23] Appendix I, Exhibit E.

[24] Mr. Leach reported that he also participated in the publishing of the Professional Access Programming Technical Edition Guide through the Microsoft Free Access Program, which provided technical assistance to the Microsoft user community.

across Northeast Florida through providing basic needs, educational programming, focusing on college and career readiness, and enrichment grants. Mr. Leach's benevolence is exemplified by him becoming a major donor ($1,000 - $4,000) to the organization in 2022. Mr. Leach supported the program for a period of four years. He did so under the auspices of his company, Dymeng Services Technological Solutions, Inc.[25]

Last, Mr. Leach participated in the Career Academies program through the St. Johns County Schools. The program provides an opportunity for a group of students to enroll in a specific set of courses associated with a designated career area. With expertise in information technology, Mr. Leach donated his time by serving on the IT advisory council. The council supported the instruction of teachers of rising students interested in careers in technology. Mr. Leach served in this capacity for almost five years. During the course of his service, Mr. Leach's company sponsored a summer internship for a student from the school system.[26]

### Mr. Leach's Community Support

Mr. Leach continues to receive unwavering support and encouragement from his ex-wife and other extended family members. All of his relatives and friends are respected, law-abiding citizens. As such, they are in a position to assist and encourage Mr. Leach to comply with any and all conditions of the court, upon his restoration to the community.

Several persons in the general community who are knowledgeable of Mr. Leach character have written letters of support on his behalf. They are appended to this report for the court's further

---

[25] Appendix I, Exhibit F.

[26] Mr. Leach reported that he also participated in the Young Eagles/EAA Program. The mission of the program is to introduce and inspire kids in the world of aviation. It gives the children their first free ride in an airplane. From https://www.eaa.org/eaa/youth/free-ye-flights.

consideration.[27]  The collective theme of their sentiments is that Jack Leach is dedicated to the community, his children, and is a man of compassion and good character.  None of the letter writers indicate that they have seen anything in Mr. Leach's background that presents an ongoing threat to any part of the community.

### Statistical Information

A review was conducted of the application of comparative statistical sentencing according to the Judicial Sentencing INformation ("JSIN"), utilized by the Sentencing Commission to compile sentencing outcomes for cells in the Sentencing Table.[28]  In the cell from the Table corresponding to total offense level 43 and criminal history category I, the **average sentence for all cases within the cell for the past five fiscal years (FY2020-2024) was 345 months**.[29]

In this case, **the advisory guidelines term of imprisonment is 360 months** , which is the statutory maximum term of imprisonment.[30]  Therefore, a sentence under the advisory guideline system might create an unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct.  Accordingly, for this reason, a variance may be warranted.

---

[27] Appendix II, Exhibits 1-3.

[28] JSIN – Provides annual data on sentencing outcomes based on the primary offense guideline.  A special feature allows user to click on specific cells of the sentencing table based on the total offense level and the criminal history category. It is programmed to reflect data restricted to the past five years, which tends to be higher due its failure to account for the effect of downward trending of sentences over that span of time. The JSIN is limited to length of imprisonment. (Federal Defendants in Selected Cell.)

[29] Appendix I, Exhibit G.

[30] As reflected in the presentence report, the advisory guidelines sentence is capped at 360 months by the maximum statutory term of imprisonment of 30 years. Therefore, there is no range of imprisonment indicated.

**Recently Sentenced Cases for Attempted Production of Child Pornography**

Since it is imperative that the court consider the national sentencing landscape in its § 3553

analysis, the following examples will serve to illustrate recent sentences imposed on similarly situated

defendants across the country:

- United States v. Boogren, Eastern District of Wisconsin, Case No. 25-CR-115: Convicted of one count of production of child pornography. Sentenced on January 20, 2026 to **180 months imprisonment**, to be followed by 5 years supervised release.[31]

- United States v. Supan, Middle District of Florida, Case No. 8:25-cr-05-WFJ-CPT: Convicted of one count of production of child pornography and one count of coercion and enticement of a minor to engage in sexual activity. Sentenced on January 16, 2026 to **180 months imprisonment**, to be followed by 10 years supervised release.[32]

- United States v. McGalem, Eastern District of Virginia, Case No. 1:22-CR-48: Convicted of one count of attempted production of child pornography. Sentenced on November 9, 2022 to **192 months imprisonment**, to be followed by 10 years supervised release.[33]

- United States v. Miller, Western District of Louisiana, Case No. 6:23-CR-00034-1: Convicted of one count of attempting to entice a minor to engage in criminal sexual activity and two counts of attempted production of child pornography. Sentenced on December 21, 2023 to **204 months imprisonment** on each of three counts, to run concurrently, to be followed by three concurrent life terms of supervised release.[34]

- United States v. Foster, Middle District of Pennsylvania, Case No. 3:24-CR-00132-MEM(l): Convicted of one count of attempted production of child pornography.  Sentenced on November 14, 2025 to **210 months imprisonment**, to be followed by 10 years supervised release.[35]

As illustrated by the above sentencings, the seriousness of the offense, and the need for just

punishment, are not precisely and uniformly proportional to variable factors.  Special attention should be

---

[31] Appendix I, Exhibit H.

[32] Appendix I, Exhibit I.

[33] Appendix I, Exhibit J.

[34] Appendix I, Exhibit K.

[35] Appendix I, Exhibit L.

14

paid to the irony that the sentences for the first two cases, featuring convictions for (actual) production of child pornography, were limited to the minimum mandatory 15 years (180 months), while the remaining three cases, featuring convictions for <u>attempted</u> production of child pornography – as in the case sub judice -- received <u>greater</u> sentences.[36] What's more, the case involving defendant <u>Miller</u> features convictions for two counts of attempted production, in addition to a third count of attempting to entice a minor to engage in criminal sexual activity. These incongruous outcomes, while presumably not arbitrary, are no less inverted and otherwise distorted.

The cases cited are only a representative sample of a number of cases where the courts have imposed sentences more in line with the individual nature and circumstances of the offense, as well as the history and characteristics of the offenders. The offense conduct typified in the examples above is either wholly compatible with, or most likely, greater in severity of the conduct of the defendant in the instant offense. Accordingly, under an analysis of § 3553 factors, this information may be relevant to the calculus of a determination of the possibility of an unwarranted sentencing disparity, and the imposition of a sentence that is greater than necessary.

<u>**Factors Militating in Favor of a Variance from the Advisory Guidelines System**</u>

*(In April 2025, the U.S. Sentencing Commission approved amendments to the federal sentencing guidelines, effective November 1, 2025. One such amendment, referred to as "Simplification" seeks to simplify the guidelines by removing step two of the former three-step sentencing process, which required courts to consider departures provided for within the Guidelines Manual.[37])*

---

[36] In cases involving attempts, solicitations, or conspiracy, i.e., inchoate offenses, as a matter of policy, the Commission allows for a 3-level downward decrease in the offense level unless the defendant completed all the acts for the successful completion was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control. USSG §2X1.1. Therefore, the Commission otherwise distinguishes in the nature (severity) of the offense under inchoate circumstances. This may be informative of the statutory consideration of the nature and circumstances of the offense for § 3553 analysis.

[37] While retaining some provisions (e.g., Substantial Assistance), the amendment deletes most departures from the Guidelines Manual and moves them to an appendix for future reference and makes several other conforming changes throughout the manual. USSC 2025 Amendments in Brief.

Most critically, USSG §1B1.1. <u>Application Instructions</u> will now provide the following: STEP TWO: CONSIDERATION OF

15

The history and characteristics of Mr. Leach, as evidenced by the existence of untreated early-age trauma, militate in favor of a sentence outside of the advisory guidelines system. The importance of these circumstances is reinforced by the status of Mr. Leach's diminished mental and emotional condition at the time of the offense. According to former departure guideline USSG §5H1.3. Mental and Emotional Conditions (Policy Statement), mental and emotional conditions may be relevant in determining whether a departure was warranted, if such conditions, individually, or in combination with other offender characteristics, are present to an unusual degree, and distinguish the case from the typical cases covered by the guidelines.[38]

In this case, there are aspects of Mr. McGhee's mental and emotional health that are exceptional and were influential to the development of his psychological condition extant at the time of the offense. Mr. Leach's mental and emotional status contributed to his failure to exercise control of behavior that he knew was wrongful. Therefore, for this reason, in combination with other aspects of Mr. McGhee's specific personal circumstances, a sentence outside of the advisory guideline system may be warranted.

Additionally, as reflected earlier, statistical comparisons of national sentencing outcomes for similarly situated offenders are substantially less than is proposed by the advisory guidelines sentence in this case. Consequently, a sentence under the advisory guidelines system would promote a likely

---

FACTORS SET FORTH IN 18 U.S.C. § 3553(a).— After determining the kinds of sentence and guidelines range pursuant to subsection (a) of §1B1.1 (Application Instructions) and 18 U.S.C. § 3553(a)(4) and (5), the court shall consider the other applicable factors in 18 U.S.C. § 3553(a) to determine a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Specifically, as set forth in 18 U.S.C. § 3553(a), in determining the particular sentence to be imposed, the court shall also consider — [provisions (a)(1)-(4) as reflected currently in the statute, and (a)(5) the need to provide restitution to the any victims of the offense]. From https://www.ussc.gov.

[38] The Commission envisioned and framed this 2025 amendment to be outcome neutral. As such, the removal of departures from the Guidelines Manual does not reflect a determination by the Commission that the rationale underlying the deleted departure provisions is no longer informative or that a court should no longer consider such facts for purposes of determining the appropriate sentence. The removal of departures does not limit the information courts may consider in imposing a sentence and it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a). USSG App. C, Pt. III. Compilation of Deleted Departure Provisions.

sentencing disparity prohibited by 18 U.S.C. § 3553(a)(6). This is especially true because the inchoate nature of the offense contrasts disproportionately with sentences received for offenses involving sexual contact during actual production. Consequently, this factor may warrant a sentence outside of the advisory guidelines system.

Accordingly, it is anticipated that a sentence that balances the need for the sentence, especially with respect to the need for medical [psychological] care, or other correctional treatment in the most effective manner, would constitute a sentence that is sufficient to satisfy all of the purposes of 18 U.S.C. § 3553(a)(2)(A)(1)-(7).[39] Therefore, a sentence outside of the advisory guideline system may be warranted.

**Certainty vs. Severity of Punishment**

Mr. Leach has pleaded guilty to an offense punishable by a term of up to 30 years imprisonment. While the plea agreement offers some benefit to Mr. Leach, he is faced with the certainty of 15 years imprisonment, should the Court impose a sentence limited to the statutorily required sentence. Mr. Leach will be 44 years of age at the time of sentencing and he faces the risk of an extended absence from his sons for the entirety of their childhoods. Based on current life expectancy tables, if Mr. Leach is sentenced to the advisory guidelines sentence of 30 years, for all practical purposes, such a sentence would constitute a virtual life sentence, as Mr. Leach, from an actuarial perspective, would not be expected to live beyond 76.5 years.[40] Moreover, such a sentence would have the anomalous effect of producing a sentence even in excess of a sentence for murder across all statistical measures.[41] Mr. Leach recognizes

---

[39] Appendix I, Exhibit M. The Bureau of Prisons operates the "Resolve Program." It seeks to decrease the incidence of trauma related psychological disorders and improve inmates' level of functioning.

[40] Appendix I, Exhibit N.

[41] Appendix I, Exhibit O. During FY2025, for the offense of murder, the mean sentence length was 286 months and the median length was 292 months.

that whatever sentence the court imposes, it will require his most fervent attention and compliance with the Court's order.

Given Mr. Leach's remorse, early acceptance of responsibility, cooperation with the government, commitment to self-improvement, and other strong factors in mitigation articulated throughout this report, a sentence under the advisory guideline system would produce no additional statutory benefit to society, in light of Mr. Leach's unique history and characteristics.  Criminological research to date indicates that increases in the <u>certainty</u> of punishment, as opposed to the <u>severity</u> of punishment, are more likely to produce deterrent benefits.[42]  Mr. Leach understands and is impressed by the reality of a certain term of imprisonment.

### Conclusions

In consideration of the forgoing discussion and analysis, there is ample evidence in mitigation to allow the Court to fashion a sentence at variance from the advisory guidelines system.  This position is particularly supported by Mr. Leach's troubled childhood, lack of prior evidence of child sexual abuse, and additional factors such as the need to avoid an unwarranted sentencing disparity.  It is anticipated that in light of the factors addressed in this report, the Court may be urged to impose a sentence that is "sufficient but not greater than necessary" based on the principle of parsimony.  This balance may be reached by a sentence restricted to the statutorily required sentence of 15 years.

---

[42] Wright, Valerie Ph.D., <u>Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment</u>, The Sentencing Project. November 2010.

The forgoing comprehensive sentencing mitigation report has been prepared on behalf of the defendant with the cooperation of defense counsel in support of sentencing before the Honorable Wendy W. Berger, United States District Judge in the Middle District of Florida.

Respectfully submitted,

/s/ *C.R. Dawson*

_____

Carlos R. Dawson
Sentencing Mitigation Consultant
The Cord Strategies Group, LLC
Jacksonville, Florida
e-mail: crd@cordstrategiesgroup.com

**CARLOS R. DAWSON**

**THE CORD STRATEGIES GROUP, LLC**
**SENTENCING MITIGATION ▪ CAPITAL SENTENCING MITIGATION ▪ ALTERNATIVE DISPUTE RESOLUTION**
**Jacksonville, Florida**
**(904) 910-5059**
**crd@cordstrategiesgroup.com**

**RESUME**

**Experience**

**Sentencing Mitigation Consultant/Florida Supreme Court Certified Civil and Appellate Court Mediator, The Cord Strategies Group, LLC**

September 2012 - Present

Serves as the Group's principal sentencing mitigation consultant, specializing in federal criminal sentencing mitigation support for criminal defendants and families

Capital/Death Penalty Mitigation Support Consultant

Licensed Agency Investigations

Maintains a mediation practice with certification in circuit civil and appellate court cases in the State of Florida

Alternative Dispute Resolution (ADR) Consultant

Investigator Florida Dispute Resolution Center (DRC) Mediator Qualifications/Training Review Board

**Sentencing Guidelines Specialist, Administrative Office of United States Courts**

1988 - September 2012 (Retired)

Appointed by the Honorable Wm. Terrell Hodges

Prepared judicial recommendations which included in-chambers briefings to federal judges regarding applicability of sentencing guidelines and the applicability of factors in aggravation and mitigation of sentencing

Conducted more than 1,000 complete presentence investigations on federal criminal defendants for all federal offenses

Served as lead investigator on teams addressing complex litigation, for cases such as, conspiracy offenses, white collar crime, mortgage fraud, commercial sex acts, sexual exploitation of minors, internet child pornography, racketeering, bid-rigging, and offenses involving high profile defendants

Conducted presentence investigations and reports on corporate and organizational defendants with recommendations to federal judges for sentencing

1

Maintained knowledge of changes in case law, criminal statutes, and sentencing guidelines promulgated by the United States Sentencing Commission

Regularly staffed cases with the United States Attorney to ascertain case theory

Collected and interpreted voluminous discovery; evaluated evidence for inclusion in recitation of offense conduct in support of judicial findings at sentencing

Compiled and evaluated complex criminal histories to determine factors in aggravation and mitigation of the offense

Facilitated and mediated Position-of-the-Parties meetings between Assistant United States Attorneys and defense attorneys on disputed legal and sentencing guidelines issues

Authored addenda to the presentence report, supported by case law, reflecting the position of the probation office on unresolved issues between the government and the defendant prior to sentencing

Reviewed and interpreted medical, psychiatric, psychological, and substance abuse reports to ascertain factors in mitigation permissible under the sentencing guidelines and case law

Testified at sentencing and revocation hearings

Conducted complex financial investigations to make recommendations on sentencing guidelines adjustments, and defendant's ability to pay fines and restitution

Communicated with victims and created victim impact statements for consideration at sentencing

Counseled families of defendants on the nature of the federal sentencing guidelines and the federal sentencing process

Supervised felons on probation, supervised release, and military parole

**Education**

University of North Florida, Jacksonville, Florida - Master of Public Administration/Concentration in Urban Studies (MPA)

Florida State University, Tallahassee, Florida - Bachelor of Science: School of Criminology - 18 Cognate Hours in Psychology, Sociology, and Government/Dean's List

Florida International University, Miami, Florida - Special Student: Expository Writing

**Professional Associations**

National Alliance of Sentencing Advocates and Mitigation Specialists (NASAMS) – Death Penalty Section

Florida State Courts Dispute Resolution Center

**Licenses**

State of Florida Class A Private Investigative Agency License (No. A-3100004)

State of Florida Class C Private Investigator License (No. C-3000278)

2

**Certifications**

Supreme Court Certified Circuit Civil Court Mediator – Florida Dispute Resolution Center (No. 29167 RA)

Supreme Court Certified Appellate Court Mediator – Florida Dispute Resolution Center

**Publications**

The Three Tiers: Sentencing Mitigation in Federal Cases. The Florida Defender, 12-15. (2015, Spring)

How an Idea Becomes a Federal Sentencing Guidelines Amendment. The Florida Defender (2016, Spring)

**Media**

Panelist on Media Roundtable with the Florida Times Union. Questions and Answers: Basics of Federal Sentencing Guidelines and Practice.  Law Offices of the Bedell Firm, Jacksonville, Florida (August 2017).

**References**

Supplied Upon Request